O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SAMUEL TOVEN, | ) | **CASE NO.: CV 06-7260 ABC (RZx)** |
| | ) | |
| Plaintiff | ) | **FINDINGS OF FACT AND CONCLUSIONS** |
| | ) | **OF LAW** |
| v. | ) | |
| | ) | |
| METROPOLITAN LIFE INSURANCE | ) | |
| COMPANY; CONSOLIDATED GRAPHICS, | ) | |
| INC. WELFARE BENEFIT PLAN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

Plaintiff Samuel Toven ("Plaintiff" or "Toven") filed a complaint against the Consolidated Graphics, Inc. Welfare Benefit Plan (the "Plan") alleging a failure to extend disability benefits in accordance with the Plan and the Employee Retirement Income Security Act of 1974. Metropolitan Life Insurance Company ("MetLife") administers the Plan. Both sides submitted their Opening Trial Briefs on January 7, 2008, and their Responsive Trial Briefs on January 28, 2008. Upon the filing of these briefs, the matter was taken under submission. However, on February 13, 2008, the parties submitted a stipulation to stay the case pending the United States Supreme Court's decision in <u>Metropolitan Life Ins. Co. v. Glenn</u> ("<u>Glenn</u>").  This Court approved

the stipulation and stayed the matter, and the Supreme Court issued its decision in <u>Glenn</u> on June 19, 2008.  128 S. Ct. 2343 (2008). Thereafter, both sides submitted supplemental opening briefs on August 22, 2008, and supplemental responsive briefs on September 12, 2008. The matter was then once again taken under submission.

### Findings of Fact[1]

This is an action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, <u>et seq.</u> ("ERISA") for recovery of long term disability benefits under the Plan.  On November 14, 2006, Plaintiff filed a Complaint with this Court seeking review of MetLife's rejection of his claim for long term disability ("LTD") benefits under the Plan.  The Administrative Record ("AR") is attached as Exhibit A to the Declaration of Cindy Broadwater, filed by Defendants on January 7, 2008.

Plaintiff Samuel Toven was employed as a bindery supervisor with Consolidated Graphics in Westlake Village, California, from 1994 to 2006.  (AR 73, 185.)  In that position, Plaintiff oversaw up to twenty to thirty people, and "assist[ed] in all phases including planning material handling, set ups and some machine operations," such as "folders and cutters."  (AR 73.)  According to the description provided by his employer, Plaintiff's job consisted of "[o]versee[ing] the coordination and running of the equipment while assigning, observing, and directing personnel for each part of the bindery

---

[1]The Court has elected to issue its decision in narrative form because a narrative format more fully explains the reasons behind the Court's conclusions, which aids appellate review and provides the parties with more satisfying explanations.  Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.

1  operation." (AR 19.)  Physically, "[m]uch of the time [in Plaintiff's

2  job] is spent walking, observing, reaching, bending, stooping, lifting

3  (minimum of 35 pounds), and standing with intermittent pulling,

4  pushing, climbing, and kneeling." (AR 19.)

5      The parties do not dispute that at all relevant times, Plaintiff

6  was an eligible participant in the Plan, which is governed by ERISA.

7  Pursuant to the terms of the Plan, MetLife determines eligibility for

8  benefits. (AR 229.)  MetLife also funds the benefits to be paid under

9  the Plan. (AR 227.)

10     The Plan contains the following provisions granting MetLife

11  discretion to administer claims:

12         MetLife in its discretion has authority to
           interpret the terms, conditions, and provisions of
13         the entire contract.  This includes the Group
           Policy, Certificate and any Amendments.
14
   (AR 189.)
15
           **Discretionary Authority of Plan Administrator and**
16         **Other Plan Fiduciaries**
           In carrying out their respective responsibilities
17         under the Plan, the Plan Administrator and other
           Plan fiduciaries shall have discretionary
18         authority to interpret the terms of the Plan and
           to determine eligibility for and entitlement to
19         Plan benefits in accordance with the terms of the
           Plan.  Any interpretation or determination made
20         pursuant to such discretionary authority shall be
           given full force and effect, unless it can be
21         shown that the interpretation or determination was
           arbitrary and capricious.
22
   (AR 229.)
23
       The Plan defines disability, in pertinent part, as follows:
24
           "Disabled" or "Disability" means that, due to
25         sickness, pregnancy, or accidental injury, you are
           receiving Appropriate Care and Treatment from a
26         Doctor on a continuing basis; and

27         1. during your Elimination Period and the next 24
           month period, you are unable to earn more than 80%
28         of your Predisability Earnings or Indexed

> Predisability Earnings at your Own Occupation for any employer in your Local Economy; or
>
> 2. after the first 24 month period, you are unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability earnings.
>
> . . .
>
> "Own Occupation" means the activity that you regularly perform and that serves as your source of income. It is not limited to the specific position you held with your Employer. It may be a similar activity that could be performed with your Employer or any other employer.

(AR 205.)

On August 26, 2004, Plaintiff suffered the loss of sight in his left eye when a bungee cord struck him in the face.[2]  (AR 62, 134.) Over a year later, Plaintiff worked his last day at Consolidated Graphics on October 8, 2005.  (AR 179, 185.)  On approximately January 12, 2006, Beth Digirolamo of Consolidated Graphics appears to have called MetLife to initiate a claim for disability benefits on Plaintiff's behalf.  (AR 185.)  MetLife recorded that Plaintiff was prevented from working by "blood sugar out of control, stress, depression, fatigue," without mention of the eye injury.  (AR 185.)

From the beginning, there was confusion at MetLife regarding Plaintiff's benefits.  MetLife initially tagged his application as one for short term disability ("STD") benefits, not LTD, with an expected return to work date of June 1, 2006.  (AR 183, 185.)  Accordingly, MetLife sent Plaintiff a letter on January 13, 2006, indicating it had

---

[2]There is nothing in the record to suggest that this accident occurred at work, although for purposes of this case it is irrelevant whether his eye injury was work-related or not.

4

reviewed his application for STD benefits; the letter stated that MetLife had been unable to contact Plaintiff's physician by telephone, and informed Plaintiff that his application would be decided without further information unless his physician called within one week.  (AR 183.)

It is unclear where this confusion originated, but Plaintiff's employer seems to have been aware of the correct situation, informing MetLife by email on January 24, 2006 that Plaintiff's STD coverage was through the State of California, not MetLife.  (AR 179.)  Apparently, though, this caused MetLife to deny Plaintiff's "claim" for STD, and send Plaintiff a letter on January 26, 2006 informing him that he was "not eligible for Short Term Disability with Metropolitan Life."  (AR 168, 177.)  Plaintiff's employer thus had to contact MetLife again, to explain that Plaintiff "was requesting LTD and was denied Short term. I think there has been some confusion on what he was actually requesting from MetLife."  (AR 175.)

The record is unclear as to when Plaintiff's STD coverage through California was scheduled to (or did) expire.[3]  However, on February 3, 2006, MetLife finally opened an LTD claim file for Plaintiff, which was handled by a different case manager than the aborted STD "claim." (AR 1.)  On February 22, 2006, the new case manager, Noemis Marcano-Molina, spoke with Plaintiff by phone, and sent him a letter

---

[3]The only documentation in the record regarding Plaintiff's state STD claim is a Physician's Supplementary Certificate completed by Dr. Azizad on December 8, 2005, in which he identified "DM II on Insulin" and "Depression" as Plaintiff's disabling conditions, and stated that Plaintiff could not return to work due to "blood sugars out of control causing extreme fatigue, poor health causing stress and depression." (AR 97, 158.)  Again, there is no mention of the eye injury.  Dr. Azizad estimated that Plaintiff might be able to return to work by June 1, 2006.  (AR 97, 158.)

requesting specific information needed to consider his LTD claim.  (AR
2-3, 164.)  She also requested records from Plaintiff's primary care
physician, Dr. Masoud Azizad.  (AR 162.)

On March 1, 2006, Plaintiff completed numerous required forms
(see AR 62-76), including a "Disability Claim Employee Statement," in
which he claimed to be disabled as of October 8, 2005 due to "stress -
depression," "blood sugar control," and "neuropathy," with no mention
of his eye injury.  (AR 76).  Dr. Azizad completed MetLife's Attending
Physician Statement on March 10, 2006, in which he indicated that he
had advised Plaintiff to cease work on October 6, 2005, diagnosed
Plaintiff with poorly controlled diabetes and depression/anxiety, and
noted subjective symptoms of high stress, insomnia, and depression
causing an erratic eating pattern and poor diabetic control.  (AR 47.)
Dr. Azizad recommended that Plaintiff lower his stress by taking leave
from work (AR 47), indicated that Plaintiff "is unable to engage in
stress situations and engage in interpersonal relations," that
Plaintiff could lift/carry up to 20 pounds "frequently" and more than
20 pounds "occasionally" (AR 48), and that Plaintiff could "work a
total of 0 hours per day."  (AR 48.)  Dr. Azizad indicated that
Plaintiff had a Class 2 (slight) cardiac limitation and that his
prognosis for returning to work was "fair."  (AR 48.)  Dr. Azizad did
not mention Plaintiff's eye injury.

Plaintiff also submitted Dr. Azizad's treatment notes for the
previous several months.  The notes from October 5, 2005 indicate that
Plaintiff's blood sugars were poorly controlled, and that he was
experiencing insomnia, an inability to concentrate, depression and a
lot of pressure at work.  (AR 52.)  The same day, Plaintiff was placed

into an intensive glycemic control program called ACCORD.  (AR 77.[4])
Dr. Azizad continued to treat Plaintiff into 2006.  The January 5,
2006 treatment notes indicate Plaintiff was "doing well but has severe
wrist/hand pain esp[ecially] at night" and that Plaintiff might have
carpal tunnel syndrome (CTS).  (AR 50.)

On January 13, 2006, Plaintiff was treated by Dr. Ting-Lin Kao.
Dr. Kao's treatment notes indicate that Plaintiff had diabetes ("DM
II") and related neuropathy, that Plaintiff was participating in a
diabetes research project, that he was on medication for numbness of
toes and checked his feet daily, and that he complained he had had
numbness in his fingers for six months and bilateral shoulder pain for
several months, especially when he elevated his arms.  (AR 127.)  Dr.
Kao's assessment was that Plaintiff had depression and probably CTS;
for Plaintiff's shoulder pain, Dr. Kao recommended naproxen and
ordered a shoulder x-ray.  (AR 129-30.)  This x-ray, performed January
18, 2006,  indicated "osteoarthritic changes of the acromioclavicular
joint."  (AR 124.)

Dr. Azizad's February 23, 2006 notes indicate that "Plaintiff is
doing well[,] still under a lot of stress/depression.  Feels better
but still poor sleep and concentration."  (AR 50.)

Plaintiff also submitted notes from Dr. Moises Vargas, from whom
Plaintiff was receiving individual psychotherapy, dated from
approximately November 22, 2005 through March 7, 2006.  (AR 100-120.)
In these notes, Dr. Vargas assessed Plaintiff as having symptoms of
post-traumatic stress disorder, "and intermittent depressed mood

---

[4]This document appears to have been misdated originally.  The
handwritten date states "10/05/06," but that is inconsistent with the
timeline established by the rest of Plaintiff's file, which suggests
he began treatment in the ACCORD program in early October 2005.

starting this summer. [Plaintiff] is on Sertraline . . . and has noticed improvement in affect." (AR 100.)   Plaintiff also submitted notes from approximately October 6, 2005 through March 9, 2006, from group therapy for Viet Nam veterans in which he was participating. (AR 138-153.)[5]

The information Plaintiff submitted to MetLife in March 2006 included a "Personal Profile" form in which he described his present condition as follows: "I have been depressed and under a lot of stress.  Problem with my feet, hands & shoulders.  I have trouble seeing since I lost vision in left eye.  I can not stand & walk for extended periods." (AR 68.)  He also stated, "I have had very much trouble falling asleep and sleeping through the night. . . . My hands & shoulders hurt while dressing is a small problem reaching and fastening." (AR 69.)  In response to the question, "When do you expect to return to your last job/occupation either on a full-time or part-time basis?" Plaintiff stated, "I can not say at this time for sure but physically I do not think I can perform my present job duties or handle the stress of my job and being on my feet for long periods of time." (AR 70.)  When asked if accommodations could help him return to his job, Plaintiff responded "My job duties are pretty cut & dry.  No room for modification that I can see." (AR 70.)  With respect to his non-work activities, Plaintiff reported "My vision gives me problems on the computer for extended time.  ½ hr to 1 hr at most at a sitting.  Walking 10-15 min without discomfort." (AR 71.)  Finally, Plaintiff also submitted proof that he had applied for social

---

[5]   The notes from the group therapy sessions do not refer to any group member specifically.  As such, they are not useful for assessing Plaintiff's particular condition at any given time.

security benefits.  (AR 155.)

On March 16, 2006, Plaintiff's assigned case manager at MetLife referred Plaintiff's claim file for a clinical consult; the file was thereafter reviewed by two nurse consultants, including one specializing in psychological/psychiatric issues.  (AR 4-7.)  The first nurse consultant noted, on March 20, 2006, that the "medical record from 1/13/06 state[s] diabetes is currently followed by outside physician with good control. . . . These lab results and blood sugar readings show that your diabetes is under control.  Physical medical on file does not support a severity of impairment.  Action plan: Claim to be referred to PCS to review all psych notes."  (AR 5.)

The nurse consultant specializing in psychiatric issues reviewed the medical records and concluded, also on March 20, 2006:

> Medical does not support a severity of impairment based on a psychiatric diagnosis, as information from Dr. Vargas, a[s] state[d] in MSE [mental status examination], office visit notes dated 12/27/2006 [sic] through 3/2006, that EE [employee] is well groomed, in casual clothing, good hygiene, calm, cooperative, no psychomotor disturbance notes, speech is normal rate, tone and fluency, mood is euthemic, affect is jovial, calm, thought process is linear, and goal directed, cognition is intact, alert and oriented.  Insight and judgment and impulse control are good.

(AR 7.)

By letter dated March 24, 2006, MetLife denied Plaintiff's claim for benefits.  (AR 43-45.)  MetLife noted that Plaintiff was "claiming Total Disability due to Diabetes Mellitus Type II, Diabetic Neuropathy, Depression and Anxiety, with subjective complaints of High Stress, Insomnia, Depression Causing Erratic eating pattern and poorly [sic] Diabetic Control.  You are a Binery [sic] Manager for Consolidated Graphics and your own occupation is considered to be

medium in nature." (AR 44.)  In this denial letter, MetLife
identified the records submitted with the claim and noted certain
information contained therein.  MetLife concluded, "In summary, there
is no clinical evidence to support your inability to perform your work
duties, such as; diagnosis and symptoms that would prevent you from
completing your activities of daily living or that would prevent you
from performing duties of your work.  Specific impairments,
restrictions and limitations, in overall functioning, that describes
your current status.  Current and planned treatment, including
medication that describes your current status." (AR 44-45
(punctuation as in original).)  MetLife also informed Plaintiff of his
right to appeal.  (AR 45.)

Thereafter, Plaintiff sent MetLife a letter dated June 23, 2006,
entitled, "RE: Long Term Disability / **Notice of Appeal**".  (AR 32.)
Plaintiff informed MetLife that Social Security had awarded him
disability benefits, and further explained his physical condition.
(AR 32.)  Plaintiff stated:

> [I]n my case my job is the major problem
> contributing to my physical ailments and my
> diabetes being harder and harder to manage.  The
> everyday stress of the job is the cause of my
> depression and could be directly linked to the
> difficulties I am having controlling my diabetes.
> I was suffering from extreme fatigue and having
> problems sleeping, regularly sleeping 3-4 hours a
> night and not consecutively.  Being on my feet 8
> to 10 hours a day was really causing me problems
> and my decision making was becoming questionable
> at best.  [¶]  Yes a lot of these symptoms and
> complications are improving since I have been
> taken out of this environment and I have been
> taking some new medication and I have increased
> the dosage of others along with my bi-weekly
> therapy sessions.  Now I'm looking forward to
> reducing the medications and hopefully benefit
> from therapy where I can also reduce the number of
> sessions.  This is a goal that would provide for
> me to live a longer and healthier life.  The one

1    thing that will not change is the loss of sight in
     my left eye.  This is a true problem in my
2    occupation since as a working manager I must check
     and ok printed jobs for flaws and manage and
3    assist people working on high speed equipment on a
     daily basis.  This I fear could put myself and
4    others in some danger at times.  I must also admit
     that the loss of sight in my left eye may have
5    also contributed to my depression because of the
     difficulty it was causing me on a day to day basis
6    at my job.

7    (AR 32.)

8        Plaintiff also submitted additional medical records on appeal.

9    He submitted a neurological evaluation completed by Dr. Azizad on

10   April 6, 2006.  Dr. Azizad indicated a diagnosis of "diabetes with

11   neuropathy & depression/anxiety," and gave a prognosis of "fair." (AR

12   37.)  Dr. Azizad stated that, with regard to Plaintiff's hands and

13   fingers, there is "poor sensation causing difficulties with

14   manipulation & gripping of materials," and that Plaintiff had

15   "[decreased] sensation."  (AR 38.)  Finally, Dr. Azizad noted two

16   elements of "ocular involvement": "[left]-eye blindness, & retinopathy

17   of [right eye.]" (AR 39.)

18       Plaintiff also submitted a letter from Dr. Vargas, his

19   psychotherapist.  (AR 40-41.)  Therein, Dr. Vargas noted Plaintiff's

20   initial report of his symptoms; provided his impressions of

21   Plaintiff's condition; and stated his diagnosis that Plaintiff had

22   post-traumatic stress disorder based on "childhood family dynamics

23   further exacerbated by recent psychosocial stressors.  His anxious

24   diathesis progressed to a state of depression with neurovegetative

25   symptoms."  (AR 40.)  Dr. Vargas stated that the glucose control

26   program Plaintiff started was helping his primary endocrine problem,

27   but that several of his symptoms such as nightmares, depresssed mood,

28   and decreased motivation were related to psychological distress.  (AR

40.)  Dr. Vargas stated that many of Plaintiff's psychiatric problems had improved on sertraline, and that he was undergoing group and individual psychotherapy to help him "reconnect with his affect and have better control of his internal and external stressors."  (AR 40.)  Dr. Vargas found that many of Plaintiff's stressors had to do with his work environment, and that Plaintiff would "need ongoing pharmacotherapy and psychotherapy to alleviate these stressors."  (AR 40-41.)  Finally, Dr. Vargas recommended "gradual reintegration into normal social environments rather than prompt reintegration."  (AR 41.)

MetLife then requested independent physician review of Plaintiff's claim file by both a psychiatrist and an endocrinologist.  (AR 28.)  Reports from both Dr. Lyle Mitzner, board certified in internal medicine and endocrinology (AR 21-23), and Dr. Robert Polsky, board certified in psychiatry (AR 24-27), were faxed to MetLife on July 14, 2006 (AR 20).  Both reports indicate that MetLife was seeking a determination of whether Plaintiff had any functional limitation or impairment, and that both doctors received Plaintiff's full medical and claim record.

Dr. Polsky's report (AR 24-27) reviews records for Plaintiff from September 14, 2005 to April 24, 2006.  Dr. Polsky concluded, "[t]he medical information does not support a global level of psychiatric impairment beyond 10/08/05. . . . Information lacking from the medical documentation that would support global impairment includes suicidal or homicidal ideation, parasuicidal behaviors, evidence of mania, evidence of psychosis, or evidence of significant impairment at activities of daily living.  There is also an absence of documentation of an objective nature for a mental status exam that would indicate

problems with memory, cognition, or concentration. . . . Based upon
the medical information reviewed, [Plaintiff's] cognitive abilities
are suggested to be unimpaired. . . . The medication [Plaintiff] is
prescribed for psychiatric maintenance, sertraline, does not pose a
safety risk or cause cognitive impairment or other significant adverse
side effects. . . . There is an absence of documentation of an
objective nature for a mental status exam that would indicate problems
with memory, cognition, or concentration." (AR 26.)

Dr. Mitzner's report (AR 21-23) indicates that Dr. Mitzner
discussed Plaintiff's condition with his treating physician, Dr.
Azizad.  The report notes that Dr. Azizad felt Plaintiff's "main
reason for being unable to work was his stress and anxiety." (AR 22.)
Dr. Azizad advised Dr. Mitzner that Plaintiff was improving: "In fact
it seemed per our discussion that he felt that his stress and anxiety
was better after that time as well and was evidenced by improvement in
glycemic control. . . . I did not get the impression that his low
blood sugar episodes were happening at a frequency that would preclude
him from working at his job." (AR 22.)  Dr. Mitzner also determined:
"From an endocrinologic/glycemic perspective, [Plaintiff's] level of
functionality would be full and unrestricted work.  He would need to
be able to take his insulin and eat meals on time but that is usually
compatible with most lines of work. . . . The medical documentation
does not support functional limitations from a diabetes perspective.
As mentioned, his doctor felt that his anxiety and stress were better
controlled subsequent to October 6, 2006.  His hemoglobin A1c's have
certainly been in reasonable range throughout the period and would not
have precluded him from working.  There is no specific mention of
frequent hypoglycemic events.  Diabetics who take insulin will from

time-to-time have low blood sugar episodes.  It has to do with how frequently these occur that potentially can render people nonfunctional at work.  There is no mention here that this was an issue for him. . . . [Dr. Azizad and I] both agree that [subsequent to October 6, 2005, Plaintiff's glycemic] control was not in a range that was preventing him from functioning at work.  One would need to see frequent low blood sugar episodes or swings from high to low blood sugars or symptomatology or high blood sugars such as frequent urination, thirst, fatigue, blurred vision, and difficulty with concentration, to prevent someone from functioning on a regular basis at work. . . . Based on the information provided and my phone conversation with Dr. Azizad, [Plaintiff's] functional abilities should be full and unrestricted."  (AR 22-23.)

The same day these reports were completed and sent to MetLife, July 14, 2006, MetLife finally received a job description from Plaintiff's employer.  (AR 11.)  It does not appear that this job description was provided to either Dr. Mitzner or Dr. Polsky.

After considering the additional material, MetLife notified Plaintiff by letter dated August 8, 2006, that it had upheld its denial decision.  (AR 14-16.)  In this letter, MetLife stated that its March 24, 2006 letter had indicated that the claim was declined "due to the lack of clinical evidence to support your inability to perform your work duties.  Evidence such as diagnosis and symptoms that would prevent you from completing your activities of daily living or that would prevent you from performing the duties of your work was not received."  (AR 15.)  MetLife acknowledged receipt of Plaintiff's notice of appeal, wherein Plaintiff explained that the Social Security Administration had awarded him disability, but stated that it had to

1 administer the Plan as it was written and comply with the Plan's

2 requirements, which might differ from those of Social Security.  (AR

3 15.)  MetLife then explained that it had retained two separate

4 Independent Physician Consultants ("IPCs") to assist in the review of

5 Plaintiff's appeal, and summarized Dr. Polsky's and Dr. Mitzner's

6 reports.  (AR 16-17.)  MetLife then stated, "In conclusion, your

7 employer's Plan requires that we be provided with proof of disability

8 in order to approve benefits.  As outlined above, the medical

9 documentation submitted for review did not offer proof of disability

10 supporting your inability to earn more than 80% of your Predisability

11 Earnings at your Own Occupation.  Neither of the IPC's was able to

12 identify objective evidence or proof of an impairment that would have

13 precluded you from performing the duties of your occupation.

14 Therefore, in accordance with your employer's plan, the original claim

15 determination to decline LTD benefits was appropriate and it remains

16 in effect."  (AR 17.)

17                              **Conclusions of Law**

18 **I.   Jurisdiction And Venue**

19        This action involves a claim for long term disability benefits

20 under an employee welfare benefit plan regulated by ERISA.  As such,

21 the Court has original jurisdiction over this matter under 28 U.S.C.

22 § 1331 and 29 U.S.C. § 1132(e).  <u>Metropolitan Life Ins. Co. v. Glenn</u>,

23 128 S. Ct. 2343, 2346 (2008).  Venue in the United States District

24 Court for the Central District of California is invoked pursuant to 29

25 U.S.C. § 1132(e)(2).  The parties do not dispute the facts requisite

26 to federal jurisdiction or venue.

27 **II.  Standard of Review**

28        A denial of benefits under ERISA should be "reviewed under a <u>de</u>

novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Where the plan vests such discretionary authority in the administrator or fiduciary, the Court reviews the denial of benefits under the plan for an abuse of discretion. Id. However, in order for the abuse of discretion standard to apply, the plan must unambiguously grant discretion to the administrator or fiduciary. Kearney v. Standard Ins. Co., 175 F.3d 1084, 1089-90 (9th Cir. 1999).

In this case, it is undisputed that the Plan unambiguously grants MetLife discretionary authority both to construe the policy terms and determine eligibility for benefits: "MetLife in its discretion has authority to interpret the terms, conditions, and provisions of the entire contract. This includes the Group Policy, Certificate and any Amendments." (AR 189.) It is true that there are no "magic words" which a plan must contain in order to invoke abuse of discretion review, Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006); if there were, however, these could be the words.

Although Plaintiff at one point argued that de novo review should apply (see Pl.'s Responsive Trial Br., at 2), he has essentially conceded that the plan documents grant discretion to MetLife (see Pl.'s Opening Trial Br. at 11). Accordingly, abuse of discretion review is appropriate here. Glenn, 128 S. Ct. at 2348.[6]

_____

[6]The parties devoted significant effort to arguing the effect of Glenn on this case. However, in the Ninth Circuit, the answer is relatively simple. Glenn is entirely consistent with the previously governing framework for ERISA cases set forth in Abatie. See Burke v.
(continued...)

## III. Discussion

Having found that MetLife's decision should be reviewed under an abuse of discretion standard, the Court must determine whether MetLife abused that discretion in denying benefits.  In theory, any number of factors might be relevant to such a determination.  See Glenn, 128 S. Ct. at 2351 ("Benefits decisions arise in too many contexts, concern too many circumstances, and can relate in too many different ways to conflicts -- which themselves vary in kind and in degree of seriousness -- for us to come up with a one-size-fits-all procedural system that is likely to promote fair and accurate review.").  In practice, probably the most common such factor, and one argued at length by the parties here, is the existence of a conflict of interest.  Unquestionably, a conflict of interest must be weighed as a factor in determining whether there has been an abuse of discretion. Firestone, 489 U.S. at 115.

In addition to conflict of interest, Plaintiff points to the existence of procedural irregularities in MetLife's handling of his claim as a factor that should weigh heavily against a finding that MetLife's denial of benefits was a proper exercise of discretion. Specifically, he argues that MetLife did not investigate or evaluate his claim in an adequate, sufficient manner, pointing to numerous particular failures by the company in collecting and reviewing the information relevant to his claim.  Each of these issues will be discussed separately below, but the final decision must take into account all factors, "reaching a result by weighing all together."

---

[6](...continued)
Pitney Bowes Inc. Long-Term Disability Plan, 544 F.3d 1016, 1024 (9th Cir. 2008).

<u>Glenn</u>, 128 S. Ct. at 2351.  One factor may "act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance," <u>id.</u>, but all factors must be considered.

### A.   The Impact of MetLife's "Conflict of Interest"

The "[a]buse of discretion [standard of] review applies to a discretion-granting plan even if the administrator has a conflict of interest." <u>Abatie</u>, 458 F.3d at 965.  However, "if 'a benefit plan gives discretion to an administrator or fiduciary who <u>is operating under a conflict of interest</u>, that conflict must be <u>weighed as a</u> <u>"facto[r]</u> in determining whether there is an abuse of discretion."'" <u>Glenn</u>, 128 S. Ct. at 2348 (quoting <u>Firestone</u>, 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187, Comment d (1959))).

The Supreme Court recently confirmed that a company which "both evaluates claims for benefits and pays benefits claims" does suffer from this type of conflict of interest.  <u>Glenn</u>, 128 S. Ct. 2348.  Thus, "an insurer that acts as both the plan administrator and the funding source for benefits operates under what may be termed a structural conflict of interest." <u>Abatie</u>, 458 F.3d at 965.

In this case, the Court has already found that a "structural conflict of interest" is present.  <u>Toven v. Metropolitan Life Ins.</u> <u>Co.</u>, 517 F. Supp. 2d 1174, 1176 (C.D. Cal. 2007).  MetLife both funds and administers the Plan, and Defendant does not argue otherwise.  (Def.'s Opening Trial Br. at 2.)  However, the parties differ with respect to the extent of the conflict here, and how heavily it should weigh.  Plaintiff argues that the structural conflict of interest here is accompanied by evidence of misconduct requiring the Court to weigh that conflict much more heavily; Defendants argue that nothing in the

record requires the Court to give any more weight to the conflict than
is implicit in the mere existence of a structural conflict of
interest.

The weight to be given to a conflict will vary from case to case.
For instance, a conflict may "prove more important (perhaps of great
importance) where circumstances suggest a higher likelihood that it
affected the benefits decision, including, but not limited to, cases
where an insurance company administrator has a history of biased
claims administration. . . . It should prove less important (perhaps
to the vanishing point) where the administrator has taken active steps
to reduce potential bias and to promote accuracy, for example, by
walling off claims administrators from those interested in firm
finances, or by imposing management checks that penalize inaccurate
decisionmaking irrespective of whom the inaccuracy benefits." Glenn,
128 S. Ct. at 2351.  "A district court, when faced with all the facts
and circumstances, must decide in each case how much or little to
credit the plan administrator's reason for denying insurance coverage.
An egregious conflict may weigh more heavily (that is, may cause the
court to find an abuse of discretion more readily) than a minor,
technical conflict might." Abatie, 458 F.3d at 968.

In evaluating a conflict, a "district court may, in its
discretion, consider evidence outside the administrative record to
decide the nature, extent, and effect on the decision-making process
of any conflict of interest; the decision on the merits, though, must
rest on the administrative record once the conflict (if any) has been
established, by extrinsic evidence or otherwise." Id. at 970.  An
administrator can present evidence outside of the administrative
record demonstrating "that any conflict did not influence its

1  decisionmaking process, evidence that would be helpful to determining

2  whether or not it has abused its discretion." _Id._ at 969.    An

3  administrator might demonstrate the lack of a conflict by presenting

4  evidence:

> . . . that it used truly independent medical examiners or a
> neutral, independent review process; that its employees do
> not have incentives to deny claims; that its interpretations
> of the plan have been consistent among patients; or that it
> has minimized any potential financial gain through structure
> of its business (for example, through a retroactive payment
> system).

9  _Id._ at 969 n.7.

10     Here, both sides have offered brief excerpts from the depositions

11  of Noemis Marcano-Molina and Karen Van Aernam, MetLife employees who

12  handled Plaintiff's claim, and Dr. Lyle Mitzner, one of the two

13  independent physicians who reviewed Plaintiff's claim at MetLife's

14  request.    Nothing in these excerpts indicates that MetLife had

15  anything more than a routine structural conflict of interest -- but

16  nothing indicates MetLife took any out of the ordinary steps to

17  counteract that structural conflict, either.    As the Supreme Court

18  noted in _Glenn_, "[t]he record says little about MetLife's efforts to

19  assure accurate claims assessment." _Glenn_, 128 S. Ct. at 2351.    Thus,

20  while both case managers testified that they did not receive bonuses

21  for denying claims, and do not consider the fact that MetLife must pay

22  any benefits awarded when they decide claims, there is no evidence

23  MetLife took "active steps to reduce potential bias." _Glenn_, 128 S.

24  Ct. at 2351.

25     Accordingly, the Court finds that any conflict of interest

26  MetLife may have had was not "egregious," and does not weigh

27  particularly heavily either for or against it.    As was the case in

28  _Glenn_, MetLife's structural conflict of interest, while a factor, is

1   not in itself determinative.  Glenn, 128 S. Ct. at 2352.

2   **B.   MetLife's Failure to Investigate and Review Plaintiff's**

3   **Claim Adequately**

4   However, while MetLife's conflict, in itself, is not particularly

5   striking, it may weigh more heavily in combination with other factors.

6   "A court may weigh a conflict more heavily if, for example, the

7   administrator provides inconsistent reasons for denial . . . fails

8   adequately to investigate a claim or ask the plaintiff for necessary

9   evidence . . . fails to credit a claimant's reliable evidence . . . or

10  has repeatedly denied benefits to deserving participants by

11  interpreting plan terms incorrectly or by making decisions against the

12  weight of evidence in the record."  Abatie, 458 F.3d at 968-69.

13  Plaintiff here argues that MetLife failed to investigate his claim

14  adequately, did not ask for necessary evidence, failed to credit his

15  reliable evidence, and provided inconsistent reasons for denial.

16  While not all of Plaintiff's arguments merit much discussion, the

17  failure to investigate a claim adequately is a troubling procedural

18  irregularity.  "A procedural irregularity, like a conflict of

19  interest, is a matter to be weighed in deciding whether an

20  administrator's decision was an abuse of discretion."  Abatie, 458

21  F.3d at 972.[7]

22  _____

23  [7]Plaintiff has attempted to submit additional medical evidence
    that was not provided to MetLife during the original processing of his

24  claim.  (Decl. of Brent Dorian Brehm Authenticating Portions of Depo.
    Trs. and Additional Evid. Pursuant to Case Law, Ex. C.)  While it is

25  true that procedural failures may require a court "to consider
    evidence outside the administrative record," Abatie, 458 F.3d at 973,

26  the type of evidence submitted by Plaintiff is not the type of
    evidence this Court can consider.  When procedural "irregularities

27  have prevented full development of the administrative record," a court
    may have to "recreate what the administrative record would have been

28                                                          (continued...)

                                  21

Problematic here is the fact that MetLife failed to obtain a job description for Plaintiff's position from his employer until July 14, 2006, more than three months after his claim had initially been denied.  The definition of "disabled" under the Plan at that time was based on Plaintiff's "own occupation"; how MetLife could have known whether Plaintiff was able to perform his "own occupation" without knowing what that occupation entailed is puzzling, to say the least. Somehow, MetLife was able to describe Plaintiff's job as "medium" in nature when denying his claim (AR 43), but there is no evidence of how that conclusion was reached, or what it signifies.  True, Plaintiff himself had provided some information about his job, but there is nothing to suggest that MetLife engaged in any vocational analysis of the information he submitted; nor does it appear that the company viewed the information submitted by Plaintiff to be sufficient, as it continued to request the information directly from Plaintiff's employer.  Further, the independent physicians who reviewed Plaintiff's file on appeal never received the employer-provided job description.  Yet MetLife nonetheless relied on that job description in its final denial letter, including a long paragraph with information pulled from the employer's description.  (AR 15.)

While the employer's job description was not obtained by MetLife until late in the process, at least it was obtained.  The company does

---

[7](...continued)
had the procedure been correct."  Id.  Here, however, the evidence submitted by Plaintiff postdates MetLife's final decision.  If evidence had existed at the time of MetLife's denial that should have been in the claim file, but was not there because of MetLife's misconduct, it could have been presented to the Court now.  But there is no way the evidence at issue could have been in the claim file at the time, since it did not yet exist.  Accordingly, this Court has not considered Plaintiff's additional proffered evidence.

not appear to have ever obtained any medical records from the
treatment Plaintiff obtained due to the loss of vision in his left
eye.  This may have been understandable initially, as Plaintiff's
claim was not explicitly premised on his vision problems.  However,
Plaintiff's notice of appeal letter makes clear that his inability to
function at work was due to a combination of many factors, including
the direct impact his loss of vision had on the performance of his
duties, and the indirect impact it had as a contributing factor to his
depression.  MetLife may not have had the obligation to track down the
records of this treatment without any help from Plaintiff -- after
all, as the company points out, the Plan requires claimants to provide
proof of disability to MetLife at their own expense -- but Plaintiff
had provided the name and address of his treating opthalmologist to
MetLife early in the process, and the company never informed Plaintiff
that he would be responsible for obtaining and providing those
records.  In contrast, the company did request records directly from
Dr. Azizad.

     The failure to investigate or evaluate Plaintiff's vision issues
is really just one part of a larger problem, though.  That is, MetLife
does not appear to have considered the global nature of Plaintiff's
health concerns.  Although MetLife obtained two independent physician
evaluations, neither doctor was asked to, or did, examine the overall
state of Plaintiff's health.  Rather, discrete issues were carved out
for each doctor to review in isolation.  Dr. Mitzner evaluated
Plaintiff's diabetes, and opined solely on Plaintiff's ability to
function from "an endocrinologic/glycemic perspective." (AR 22.)  Dr.
Polsky evaluated only the psychiatric issues, and did not evaluate
Plaintiff's physical condition. (AR 26.)  Thus, no doctor reviewed

the problems Plaintiff had had with his hands and feet as a result of either neuropathy and/or carpal tunnel syndrome.  Likewise, no one addressed the fact that Plaintiff's treating physician had noted Plaintiff could not "twist/bend/stoop" or "reach above shoulder level" (AR 48).  These concerns become even more important in light of the job description no doctor ever saw, which, as MetLife noted in its final denial letter, indicated that "[m]uch of the time is spent walking, observing, reaching, bending, stooping, lifting (minimum of 35 pounds), and standing with intermittent pulling, pushing, climbing and kneeling" (AR 15).  Despite the fact that neither of the independent physicians was asked to evaluate the full picture, or was provided with Plaintiff's job description, MetLife's final denial letter nonetheless stated that "[n]either of the IPC's [sic] was able to identify objective evidence or proof of an impairment that would have precluded you from performing the duties of your occupation." (AR 17.)

     It may be that none of Plaintiff's health problems was disabling on its own, but whether the particular combination of problems he had might together be disabling is a different question -- one that was not sufficiently addressed.  Thus it appears that Plaintiff's main claim to be disabled was essentially not evaluated.  He argued that it was stress from his job, in combination with, and exacerbated by, all of his other health problems (including major problems like diabetes, and more minor ones like insomnia, trying to review the quality of his subordinates' work with impaired vision, to fix machines with numb fingers and hands that had difficulty grasping, to stand for long periods on numb feet, to lift heavy objects when his shoulders hurt and he was not supposed to bend or stoop) that prevented him from

doing his job.  Each individual complaint magnified the others, and contributed to his overall depression and stress.  His complaints, however, were not evaluated in toto, but only in an incomplete, piecemeal fashion.

Thus, to the extent the individual pieces of Plaintiff's health puzzle may have been evaluated at all, they were not necessarily seen in the full context.  As noted, the stress from his job, and trying to compensate for his various health problems while working, was a large component of his problem.  Clearly, then, removing Plaintiff from the work environment should have had a positive impact on his health, and there is evidence that it did.  But MetLife did not evaluate, and the independent reviewers were not asked to consider, what Plaintiff's condition was prior to leaving work, or to compare his condition while working to his condition while on leave.  If anything, MetLife appears to have been operating largely in ignorance both of what Plaintiff's condition might have been like while working, and of the fact that he had already been determined to be entitled to short-term disability benefits.

This problem fully manifests in the complete failure to ask the question of whether Plaintiff, whose condition had improved after leaving work, would be able to return to work without a concomitant worsening of his condition.  In other words, his condition may not have appeared that serious at the time it was reviewed, but that does not necessarily mean that Plaintiff was ready to return to work and stay healthy.  It may be that Plaintiff had recovered enough to return to work safely -- his condition may truly have been a "short-term" disability, not a "long-term" one -- but the question of whether he could go back to work without danger was never posed, let alone

answered.

In part, the failure to evaluate Plaintiff's full problems in context may have been due to the fact that MetLife did not handle his STD claim.  If MetLife had evaluated Plaintiff's request for STD, different information might have been obtained.  Further, if MetLife had made the original decision that Plaintiff was disabled from performing his job for at least the short term, there would have been something in the file to support that finding when his claim for LTD benefits was reviewed.

Of course, there is no requirement that the same company provide both short- and long-term disability coverage, but even apart from the fact that MetLife's file might have been more complete had it handled Plaintiff's STD claim, the company totally ignored the fact that Plaintiff appears to have been receiving STD benefits from the State of California.  (AR 33, 172, 179.)  Presumably, there must have been some determination that Plaintiff was entitled to these benefits before he began receiving them.  Yet MetLife made no attempt to find out any information about Plaintiff's STD claim or benefits.

In slight contrast, MetLife at least acknowledged that Plaintiff had been determined to be disabled by the Social Security Administration.  However, there is little to indicate that the company did anything more than acknowledge that fact.  Certainly, as MetLife points out, the disability standard for social security purposes may be different from that in the Plan, but that does not mean Plaintiff's social security award was irrelevant.  Simply noting that Plaintiff was receiving social security benefits, and reciting the fact that the Plan's requirements "may differ from those of the Social Security Administration," as MetLife did in its final denial letter, does not

1  qualify as an analysis of whether and how those standards are actually

2  different.

3      Looking at the big picture, it appears that MetLife virtually

4  ignored the fact that two other entities had already found Plaintiff

5  to be disabled.  If nothing else, this should have prompted MetLife to

6  take a slightly closer look at Plaintiff's claim; if both the State of

7  California and the Social Security Administration considered Plaintiff

8  to be disabled, that would seem to indicate some possibility that he

9  really was disabled, for at least some period of time.  It is possible

10 that the end result might have been the same -- that is, if MetLife

11 had conducted a thorough investigation, it may still have concluded

12 that, due to differences in standards or timing, Plaintiff did not

13 qualify for LTD benefits under the Plan -- but no analysis of the

14 differences between the Plan's disability standards and those of the

15 Social Security Administration or the California program seems to have

16 been undertaken.  And MetLife's investigation here was far from

17 thorough.

18     In short, MetLife did not properly investigate or evaluate

19 Plaintiff's claim for LTD benefits, especially in light of the fact

20 that both the federal and state governments had found Plaintiff to be

21 disabled.  Weighing this factor along with MetLife's structural

22 conflict of interest, and considering all the facts of the case, the

23 balance here tips in Plaintiff's favor.  Accordingly, MetLife's denial

24 of benefits was an abuse of discretion, and Plaintiff is entitled to

25 LTD benefits for the period during which, under the Plan, the

26 definition of disability was based on Plaintiff's "own occupation."

27 As for the question of whether Plaintiff may be entitled to benefits

28 for any period after the Plan definition of disability changed to "any

27

occupation," the matter is REMANDED to MetLife for a determination.

**IV. REMEDY**

Plaintiff has requested payment of back benefits, plus prejudgment interest.  Plaintiff is entitled to back benefits for the 24-month period ending January 6, 2008.  However, under the terms of the Plan, Defendants are entitled to a setoff for "Other Income Benefits" Plaintiff may have received, as defined in Part B of the Plan.  (AR 208-11.)

As for prejudgment interest, "[w]hether to award prejudgment interest to an ERISA plaintiff is 'a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities.'"  Landwehr v. DuPree, 72 F.3d 726, 739 (9th Cir. 1995) (quoting Shaw v. International Ass'n of Machinists & Aerospace Workers Pension Plan, 750 F.2d 1458, 1465 (9th Cir. 1985)).  "Among the factors to be considered in determining whether prejudgment interest should be awarded is the presence or absence of 'bad faith or ill will.'"  Id.  While the Court has made no explicit finding of "bad faith or ill will" in this case, the equities nonetheless balance in favor of an award of prejudgment interest to Plaintiff.  Plaintiff has been deprived of the value of benefits to which he was entitled for the period from January 2006 to the present.  As such, MetLife (and not Plaintiff) has derived benefit from those funds (including interest), and Plaintiff has been forced to bring the present action to recover funds to which he was entitled.  As the Supreme Court has often stated, "prejudgment interest 'is an element of [plaintiff's] complete compensation.'"  Osterneck v. Ernst & Whinney, 489 U.S. 169, 175 (1989) (quoting West Virginia v. United States, 479 U.S. 305, 310 (1987)) (alteration in original).  There is no indication that an

1   award of prejudgment interest would unduly burden Defendants.  As

2   such, the Court holds that such an award is appropriate.

3       Finally, Plaintiff has requested an order finding that he is

4   entitled to attorneys' fees.  However, he has not pointed to any

5   authority for such an award.  While the Court undoubtedly has

6   discretion to award attorneys' fees in ERISA cases, the award of fees

7   is not automatic, and the parties have not briefed the issue at all.

8   The Court would be willing to consider a motion for fees filed by

9   Plaintiff, but Plaintiff has to invest some effort in making the

10  request.  Further, Defendants should have the opportunity to address

11  any arguments Plaintiff may raise in favor of fees.  For now, however,

12  Plaintiff's request for fees is DENIED, without prejudice.

13                               **CONCLUSION**

14      For the foregoing reasons, the Court hereby finds in favor of

15  Plaintiff, and against Defendants.  Plaintiff shall be entitled to

16  recover LTD benefits, and prejudgment interest, in an amount

17  consistent with the terms of both this order and the Plan.  The

18  parties are ORDERED to meet and confer regarding both the amount of

19  past due benefits and interest, and the amount of offset to which

20  Defendants are entitled.  Thereafter, the parties must SUBMIT to this

21  Court, by no later than December 22, 2008, a stipulation regarding

22  both awards.  This may be in the form of a [Proposed] Final Judgment.

23  The parties are further ORDERED to meet and confer prior to the filing

24  of any motion by Plaintiff for the award of attorneys' fees and costs.

25      **IT IS SO ORDERED.**

26  **DATED:     December 2, 2008**        _____

27                                          **AUDREY B. COLLINS**
                                            **UNITED STATES DISTRICT JUDGE**
28